## The Atchison, Topeka & Santa Fe Railway Company v. Mortimer Hamlin *et al.*

### No. 13,241. (73 Pac. 58.)

#### SYLLABUS BY THE COURT.

RAILROADS — *Injury to Employee — Findings Inconsistent.* An employee of a railway company, engaged with thirty-five or forty others in relaying steel rails in a manner not to interfere with the running of trains, was struck by a passing train and killed. He was standing at the time close to one of the rails. A recovery of damages was had against the railway company, based on a general verdict and findings of fact by the jury that the foreman in charge of the men did not give audible warning to the deceased of the danger, although he did so in the ordinary way; that the train's approach was obscured by intervening workmen; that the wind and noise prevented deceased from hearing the rumbling of the train or the whistle of the engine when it was one-half mile distant, and again when 750 feet away. The jury also found that a man standing near the track, giving reasonable attention, could have heard the rumbling of the train 600 feet away; that all the men left the track except the deceased; that from nine to twelve trains passed the workmen every day; that deceased was familiar with the time of the train that struck him; and that it was expected. *Held*, that the findings of the jury summarized above were inconsistent with one another, and that other findings referred to in the opinion were not supported by the evidence.

Error from Reno district court; M. P. Simpson, judge. Opinion filed July 10, 1903. Reversed.

#### STATEMENT.

This was an action brought by Mortimer and Annie Hamlin, parents of Reuben Hamlin, to recover damages by reason of the death of their son, who was struck by a locomotive of plaintiff in error and killed while in the employ of the company engaged in laying rails. The deceased was one of a company of thirty-five or forty men engaged in such work on the line a few miles west of Hutchinson. He was struck by the locomotive which was drawing an east-bound

passenger train, known as No. 2. The jury made the following findings :

"1. If the train strike Hamlin between Sherman and Partridge? A. Do not understand question.

"2. Is the railroad-track straight between Sherman and Partridge? A. Practically so.

"3. Is the railroad-track level between Sherman and Partridge? A. Very slight down grade eastward.

"4. Was Hamlin struck by train No. 2? A. Yes.

"5. Was No. 2 expected by the steel gang? A. Yes.

"6. Had the steel gang taken out every other spike before No. 2 came? A. They were taking out every other spike.

"7. Did the steel gang leave every other spike in the rails, so they might be held in place when No. 2 passed? A. They were so doing.

"8. Was No. 2 pulled by a large ten-wheel engine? A  Yes.

"9. Did train No. 2 contain ten cars? A. Yes.

"10. At what rate of speed was train No. 2. scheduled? A. Thirty-one miles per hour.

"11. At what rate of speed did it run when it reached the steel gang? A. Twenty-five to thirty-five miles per hour.

"12. Did the engine whistle at Partridge, five or six miles west of the steel gang? A. Yes.

"13. Was the whistle at Partridge heard by any one of the steel gang? A. Yes.

"14. Did the engine whistle at the road-crossing about one-half mile west of the steel gang? A. Yes.

"15. Did train No. 2 receive the 'high-ball' signal from foreman Devine at the time it approached the steel gang? A. Yes.

"16. Did the engineer answer the 'high-ball' signal by two blasts of his whistle? A. Yes.

"17. Did the engineer answer the signal by any blast of the whistle? A. Yes.

"18. How far west of the steel gang was the engine when it acknowledged the 'high-ball' signal? A. About 450 feet.

"19. How far could the whistle blasts of that engine he heard on the morning of October 14? A. About five miles.

"20. How far was Hamlin east of the engine when it acknowledged the 'high-ball' signal? A. About 750 feet.

"21. Did Devine, foreman, warn the men of the steel gang to clear the track before the train reached it? A. Yes.

"22. If he warned the men to leave the track, how many times did he do so before the train reached them? A. Once or twice.

"23. Did he shout loud enough for a man in the exercise of ordinary care and prudence to hear him the distance Hamlin was from him? A. No.

"24. How far east of Devine was Hamlin when he shouted for the men to clear the track? A. About 300 feet.

"25. Were there other men in the steel gang east of Hamlin when Devine warned the men to leave the track? A. Yes.

"26. Did any of the men east of Hamlin hear Devine warn the men to leave the track? A. No.

"27. Did all the men leave the track except Hamlin? A. Yes.

"28. Did the men east of Hamlin leave the track when Devine shouted? A. No.

"29. Did any of the men east of Hamlin hear the engine whistle before it reached the steel gang? A. No.

"30. Did Schmidt shout to Hamlin before the engine struck him and from a point about fifty feet east of Hamlin? A. No.

"31. Did Hamlin stand on the north side of the rail? A. Yes.

"32. How far from the rail did he stand? A. Evidence shows he stood very near the rail.

"33. Was he facing south? A. Yes.

"34. Did the track run from the northeast to southwest? A. Yes, but more west than south.

"35. Did the engine strike him on the right side? A. Yes.

"36. Did the fireman see him before he was struck? A. Yes.

"37. Did he see him in time to stop or check the train? No.

"38. Was the bell ringing? A. Yes.

"39. Could the rumbling of the train be heard before it reached Hamlin? A. Yes.

"40. How far north would Hamlin have had to move in order to be clear of the engine? A. Cannot determine.

"41. Was Hamlin's hearing good? Was his eyesight good? A. Yes.

"42. Was his hearing and eyesight as good probably as that of the other men of the steel gang? A. Yes.

"43. Is there a ringing sound from steel rails when a heavy train is approaching? Yes.

"44. Can this sound be heard three or four hundred feet in front of the engine by one standing over or near the rail? A. Yes.

"45. Could Hamlin have moved out of the way had he noticed the train twenty-five feet distant? A. No evidence on this point.

"46. Could he have moved out of the way in a few seconds? A. Do not know from evidence.

"47. Is it probable that Hamlin misestimated the distance he was from the rail? A. No.

"48. Was there anything to prevent a man of ordinary care and prudence from seeing the train as it approached? A. Yes.

"49. Was there anything to prevent the man of ordinary care and prudence from hearing the train as it approached? A. Yes.

"50. If you answer the above question 'Yes,' please state what there was to prevent a man from hearing the train. A. Noise made by men at work on track between him and train.

"51. Was there anything to prevent Hamlin from hearing the blasts of the locomotive whistle as the train approached? A. Yes.

"52. Was there anything to prevent him from hear-

ing the ring from the rails as the train approached?
A. Yes.

"53. If there was anything to prevent him from
hearing the blasts of the whistle, the rumbling of the
train, or the sound from the rails, what was it? State
the facts. A. The blowing of the wind and the noise
made by the work of the other men.

"54. Did No. 2 pass through the steel gang on that
morning in the usual and ordinary way? A. Yes.

"55. Did the foreman give signals to the men in
the usual and ordinary way? A. No.

"56. Did all the men clear the track except Ham-
lin in the usual and ordinary way? A. No.

"57. How far could the rumbling of the heavy
train be heard in front of the train on the morning of
October 14, by a man standing near the track and
paying reasonable attention? A. About 600 feet.

"58. Was Devine the head foreman of the steel
gang? A. Yes.

"59. Did he perform his duty in the usual and or-
dinary way? A. Yes.

"60. Did the engineer perform his duty in the
usual and ordinary way? A. Yes.

"61. Was the morning of October 14 a clear, bright
morning? A. Yes.

"62. Was there anything on the right of way track
to obscure an approaching train? A. Nothing except
men at work.

"63. Did some of the men see the smoke five miles
off? A. Yes.

"64. Did some of the men see the train itself two
miles off? A. No.

"65. Did Devine call the Partridge gang back be-
fore he shouted to clear the track? A. He did.

"66. Did the men at the east end of the gang hear
him call them back? A. No.

"67. How many trains passed the steel gang each
day on the Santa Fe? A. From nine to twelve trains.

"68. How long had Hamlin been working with the
steel gang? A. About one month.

"69. Was he familiar with the manner in which
trains passed the steel gang? A. Yes.

"70. Was he familiar with the time when No. 2 passed east? A. Yes.

"71. Was No. 2 a heavy train? A. Yes.

"72. Was the 'high ball' a signal that the track was safe? A. Yes.

"73. Without it would there be danger of ditching the train in case of repairs? A. Yes.

"74. Is it probable that Hamlin either misestimated his distance from the rail, or misestimated either the proximity or speed of the approaching train and on that account was killed? A. No.

"75. Can his conduct be reasonably accounted for on any other kind of probability? A. Yes."

There was a general verdict, with judgment for plaintiffs below. A motion for judgment on the findings of the jury and one for a new trial were overruled. The railway company has prosecuted error.

*A. A. Hurd*, and *O. J. Wood*, for plaintiff in error.

*James McKinstry*, and *William M. Whitelaw*, for defendants in error.

The opinion of the court was delivered by

SMITH, J. : Summarizing those findings of the jury which were most favorable to the plaintiffs below, it appears that the train was coming east, and that Devine, the foreman, when he warned the men to leave the track, was standing about 300 feet west of the deceased. The men east of Hamlin did not hear Devine's warning, and did not leave the track when he shouted. Hamlin stood on the north side of the track facing south. The engine struck him on the right side. The track ran nearly east and west. The wind and the noise of the men at work on the track between him and the train prevented Hamlin from hearing the blasts of the whistle or the rumbling of the train as it

31—67 KAN.

approached. Devine, the foreman, did not shout loud enough for a man in the exercise of ordinary care and prudence to hear at the distance Hamlin was from him. All the men, except Hamlin, did not clear the track in the usual and ordinary way. The train was running from twenty-five to thirty-five miles an hour.

The findings on which the railway company relied to defeat a judgment for plaintiff below were in substance as follows: Train No. 2 was expected by the men laying the rails. They had taken out half of the spikes on each rail and left the others in place, so that the train might pass safely. The engine whistled at Partridge, five or six miles west of the place of accident. It was heard by a part of the men at least. The whistle was again sounded at a road-crossing about one-half mile west of the steel gang. Devine, the foreman, signaled the train on its approach toward the men in his charge by what is called in railroad parlance the 'high-ball' signal, indicating that it was safe for it to come on. The engineer acknowledged the signal by two blasts of the whistle when he was 450 feet from the working gang and 750 feet west of Hamlin. The blasts of the whistle could be heard about five miles. The foreman, when 300 feet west of Hamlin, warned the men once or twice to clear the track before the train reached them. All the men left the track except Hamlin. The bell was ringing. The rumbling of the train could be heard before it reached Hamlin. The deceased had good eyesight and hearing. There is a ringing sound of the rails when a heavy train is approaching, which can be heard 300 or 400 feet in front of the engine by one standing over or near the rail. The foreman gave the signals to the men in the usual and ordinary way. A man standing near the track at the time of the acci-

dent, who was paying reasonable attention, could hear the rumbling of the train 600 feet distant. The engineer and Devine, the foreman, performed their duties in the usual and ordinary manner. The morning when the accident happened was clear and bright, and some of the men saw the smoke of the train five miles off. Nine to twelve trains passed the steel gang every day. The deceased had been working about a month relaying track. He was familiar with the manner in which trains passed the men, and was familiar also with the time when train No. 2 went east. There was nothing to obscure an approaching train except the men at work.

Conceding that the foreman in charge of the men working on the track was negligent in not making his warnings understood above the noise made by the workmen and the blowing of the wind, the fact remains that he gave such warnings in the usual and ordinary manner, and nine to twelve trains passed the men in his charge every day. Beyond this, it was established that when the engine whistled five or six miles west of the place of accident some of the men heard it. It again whistled at a road-crossing one-half mile to the west. Upon its nearer approach, it answered the signal of Devine by giving two blasts of the whistle within 750 feet of Hamlin, and within 450 feet of some of his coemployees. All the men left the track except Hamlin. This last circumstance is entitled to special consideration.

The deceased, when he saw his fellow workmen, thirty-five or forty in number, leaving the track, was certainly apprised that there was a necessity for all of them suddenly to stop work. A step or two would have removed him to a place of safety. He gave no heed to this abandonment of the work by all the

others, but remained in his place until struck. The jury said that the men did not leave the track in the usual and ordinary way. If their manner of leaving was different from what it commonly was when a train passed, this of itself ought to have excited his attention. Again, knowing the frequency with which trains passed, and expecting this particular train, Hamlin was bound to take reasonable care for the preservation of his own safety, and the finding was that, with reasonable attention, a man standing near the track could have heard the rumbling of the train 600 feet distant.

It is true that in finding No. 53 the jury answered that Hamlin was prevented by the wind and the noise made by the other workmen from hearing the rumble of the train, yet, taking the two findings together, the fact remains that with reasonable attention a man situated as he was could have heard the rumbling of the train 600 feet distant, notwithstanding the wind and the noise. The element of "reasonable attention" was lacking in finding No. 53. The two findings can be harmonized only by concluding that Hamlin was not paying reasonable attention to his surroundings. In finding No. 5, the jury said that the train which struck the deceased was expected by the steel gang. The word "expect" is defined: "To look for (mentally) ; to look forward to, as to something that is believed to be about to happen or come." With his mind prepared for that which occurred, namely, the coming of the train, and his indifference to the actions of those around him, who left the track on its approach, coupled with his familiarity with the running of the trains which passed him from nine to twelve times a day during his thirty days' service, we think the deceased was guilty of such contributory negligence as

to prevent a recovery by plaintiffs below.  In *Railway Co. v. Judah*, 65 Kan. 474, 476, 70 Pac. 346, it was said :

"A signal by whistle or bell in such cases is to give warning of an approaching train.  When a traveler, about to cross a railroad-track, has notice of that which a whistle or bell signifies, the giving of such warnings is a work of supererogation as to him."

It is inconceivable that the deceased alone, of all the men, thirty or forty in number, did not hear the warnings or see the train.  It is difficult also to give credence to the finding that the deceased could not see the approaching train, there being nothing to obscure it except the men at work.  Some of the men saw the smoke of the engine and heard it whistle five miles distant.  The day was clear and bright.  Many of the findings are inconsistent with one another, and others evasively answered.  It is evident that the jury did not answer the particular questions of fact without any reference to their effect on the general verdict.  The answers returned affecting the question of Hamlin's contributory negligence, excusing his presence on the track when all the others had moved out of danger, were strained and irrational.

The judgment of the court below will be reversed and a new trial ordered.

All the Justices concurring.